UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   - v. -                                         :

                                                   S1 13 Cr. 304 (MGC)

AHMED ABASSI,                     :

        Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING SUBMISSION

The United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, John P. Cronan, Benjamin A. Naftalis, and Michael Ferrara, Assistant U.S. Attorneys, of counsel, respectfully submits this submission in advance of Abassi's July 16, 2014 sentencing. As described below, the Government respectfully requests that the Court sentence Abassi to a term of imprisonment greater than the advisory range of zero to six months' imprisonment recommended by the U.S. Sentencing Guidelines.

**I.     Factual Background**

    **A.     Abassi's Canadian Visa Is Revoked**

As set out in the U.S. Probation Office's Presentence Investigation Report ("PSR"), Abassi is a Tunisian citizen who had been residing with his wife in Canada. (PSR ¶ 8.) In early 2013, Abassi returned to Tunisia to visit family members. (Id.) While Abassi was in Tunisia, Abassi's brother, also in Tunisia, was seriously injured in a car accident. (Id.) Abassi was still in Tunisia when Canadian authorities revoked Abassi's Canadian visa because Abassi had become a target of an investigation into the activities of Chiheb Esseghaier, who was

plotting with others to derail a passenger train traveling from Penn Station, New York to Canada. (Id.) (Of course, in order to maintain the investigation's secrecy, Abassi was not told the true reason for the revocation of his Canadian visa.) However, Canadian authorities did not revoke Abassi's visa at the United States Government's request, and the PSR is wrong on that point. (Id.) As a result of the visa revocation, Abassi was unable to return to his wife in Canada. (Id.)

An undercover task force officer (the "UC") for the Federal Bureau of Investigation ("FBI") called Abassi in Canada and invited Abassi to come to the United States. (Id. ¶ 9.) Esseghiaer had introduced Abassi to the UC in Canada in late 2012, before Abassi left Canada to visit Tunisia. The UC—who purported to own and operate a real estate company in the United States—told Abassi and Abassi's parents that he could help Abassi obtain a visa to travel to the United States and that, once here, try to help Abassi obtain a new Canadian visa. (Id.)

### B.   Abassi Travels to the United States and Lies to Immigration Officials

Abassi therefore flew from Tunisia to the United States, arriving at John F. Kennedy International Airport ("JFK") on March 18, 2013.[1] (Id. ¶ 10.) Upon his arrival at JFK, U.S. immigration authorities, working with the FBI, questioned Abassi. (Id.) Among other things, Abassi told immigration authorities that, while in the United States, he planned to work for the UC's real estate company. (Id.) That statement was false, and it predicates the violation of 18 U.S.C. § 1001 charged in Count One of the Superseding Information (the "Information").

---

[1] Though the UC purported to obtain a U.S. visa for Abassi, in fact U.S. law enforcement obtained a visa for Abassi for the sole purpose of advancing the investigation. Abassi otherwise could not have obtained a U.S. visa.

## C. Abassi, Esseghaier, and the UC Spend Time Together in New York

The UC met Abassi at JFK and drove him to an apartment in Manhattan that the UC purported to maintain as part of his real estate business. Abassi resided in that apartment, free of charge, for the next few weeks. While there, Abassi frequently met with Esseghaier, the UC, or both.

During the course of those meetings, Esseghaier told Abassi about his intent to attack Americans and Canadians inside the United States and Canada. (U.S. and Canadian law enforcement had long been aware of Esseghaier's plots, and Esseghaier was under round-the-clock surveillance.) Abassi repeatedly and flatly refused to assist Esseghaier. In fact, Esseghaier became so frustrated by Abassi's refusal to undertake a terrorist attack in the near term that Esseghaier urged the UC to throw Abassi out of the UC's apartment.

However, Abassi conversations with Esseghaier and the UC revealed dangerous, extremist views, and suggested that Abassi was refusing to participate in Esseghaier's plots for the wrong reasons. Some of Abassi's conversations with Esseghaier and the UC are summarized below.

On March 27, 2013, Abassi told the UC that Esseghaier wanted Abassi to be trained overseas and then return to the United States to carry out "operations," or attacks, inside the United States. Abassi said that he would like to target Americans in the United States, but that such attacks would kill very few Americans. By contrast, Abassi said that the September 11, 2001 attacks had drawn Americans to the Middle East, where thousands had been killed. Later in that conversation, Abassi told the UC that Abassi had told Esseghaier that Essehaier could kill a hundred thousand people by putting bacteria in the air or in a water supply, but Esseghaier had dismissed the plan.

Though Abassi clearly was not then prepared to engage in terrorist attacks, Abassi did tell the UC that they should help the "brothers" in Syria, referring to the Nusrah Front, with money and weapons. As discussed below, Abassi knew that the Nusrah Front was affiliated with al Qaeda and had been designated as a foreign terrorist organization by the U.S. Department of State. Abassi also told the UC that Abassi would himself be willing to transport bags of money from the UC, presumably money intended to support like-minded individuals overseas.

On March 29, 2013, Abassi repeatedly told Esseghaier that he did not want to participate in Esseghaier's terrorist plots. However, one reason Abassi gave for not participating was that the number of American casualties from such an operation would be too few. For example, Abassi described 50 or 100 casualties as "something light." Later in the conversation, Abassi said he had "a principle, the principle that America should be wiped off the face of the Earth." However, Abassi made clear he had no current plan for attacking the United States.

On more than one occasion, Abassi told the UC that he suspected that the UC worked for the FBI. For example, on March 22, Abassi suggested that the UC might be working for the FBI, and said he was sure that the Government was watching them. Abassi went on to tell the UC that he often thought about their "work," but was worried that their families would suffer if they were arrested. On April 5, 2013, Abassi again wondered aloud to the UC whether the UC was helping Abassi because the UC worked for the FBI. Abassi said he doubted that the UC worked for the FBI because he (Abassi) was a "nobody" and the FBI would not be interested in him. Abassi also told the UC that he had no proof that the UC worked for the FBI, but had doubts about him.

On April 12, 2013, Abassi and the UC discussed the Nusrah Front, which Abassi had first mentioned on or about April 2 and with which Abassi was very familiar. Abassi

4

accurately told the UC that the Nusrah Front, a Syrian group, had recently joined al Qaeda, and that the United States had designated the Nusrah Front as a foreign terrorist organization. Abassi made clear that the conflict in Syria was a high priority for al Qaeda, explaining, "I swear to the Almighty God, that if Ayman al-Zawahiri [i.e., the current leader of al Qaeda] sees what I am doing, he would say, 'Good, continue.'" Abassi said that "the Americans . . . are killing five, 10, 20 and 50 by day in Afghanistan," but each day in Syria the Americans are killing "200, 300," and as a result Syria is now "the heart" and "the most important thing."

Abassi went on to tell the UC that he had been speaking to a person whom Abassi named and described as a very important person in the Middle East ("Individual-1"). According to Abassi, Individual-1 also was familiar with the Nusrah Front. Abassi told the UC that the UC could send money to the Nusrah Front through Individual-1. Abassi also said that weapons were relatively inexpensive in Egypt and could easily be shipped to Syria.

Also on April 12, the UC mentioned the idea of Abassi applying for lawful permanent residency, or a "Green Card," which would allow Abassi to travel throughout the world potentially to recruit like-minded "brothers." Abassi liked the idea.

Therefore, on April 15, 2013, the UC helped Abassi complete the application for a Green Card. The application required Abassi to state his current occupation. The UC suggested that Abassi write "student" or "engineer," either of which would have been somewhat accurate. Abassi, however, wanted to "stay away from the student or engineering status, or the danger that accompanies the engineering status." The UC then suggested that Abassi write down "manager" or "property manager." After some discussion, Abassi settled on "property manager" and wrote it down on the Green Card application as his occupation. That statement was false, and it predicates the violation of 18 U.S.C. § 1028(f) charged in Count Two of the Information. A later

5

question on the form asked whether Abassi had ever provided money, assistance, or material support to a terrorist group. Laughing, Abassi said, "Not yet."

On April 19, 2013, Abassi and the UC flew to Las Vegas, Nevada to meet Abassi's friend ("Individual-2"). Abassi explained to Individual-2 that he and the UC planned to financially support "the Muslim brothers first of all, and mainly in Syria," i.e., the Nusrah Front. Abassi said that "we," i.e., Abassi and the UC, were going to send up to $1 million to the Nusrah Front, but wanted to send it "without causing us a problem with anyone." Apparently referring to (but not mentioning) Individual-1, Abassi went on to tell Individual-2 that Abassi was "working with known people," specifically a well-known brother in Jordan, and had a "channel" of which he (Abassi) was "100% sure." Abassi encouraged Individual-2 to donate his own money as well.

Later, Abassi and Individual-2 argued about the meaning of "jihad." Individual-2 said, in sum, that it would be "wrong" to detonate bombs targeting civilians in the United States. Abassi asked, "[W]rong according to whom?" Abassi argued that the Quran allowed Muslims to attack Americans in the same ways Americans had attacked Muslims, including the killing of women and children.

   D.   **Abassi's Pre-Arrest Statements**

On April 22, 2013, Abassi and the UC flew back to JFK from Las Vegas. Upon their arrival at JFK, agents questioned Abassi outside the UC's presence. Agents had not placed Abassi under arrest, and the interview was voluntarily and non-custodial.

During that interview Abassi made several false and/or self-serving statements. Abassi again falsely claimed that the purpose of his travel to the United States was for business, because he was setting up a company with the UC. Abassi falsely said that he proposed a real

estate business with the UC in Tunisia, and that they were in the process of establishing that business.

Abassi also discussed Esseghaier, referring to him as "Chiheb" and denying that he knew Chiheb's surname. When asked whether Chiheb was planning a a terrorist operation, Abassi responded, "Believe me, no." As demonstrated above, that was a lie, as Esseghaier had tried and failed to recruit Abassi to participate in multiple terrorist plots. Abassi also said that he had met Esseghaier only "three or four times during the time I know him."

When asked about any conversations concerning terrorist threats to the United States in regards to "Chiheb" (i.e., Esseghaier) or the UC, Abassi persisted in his lie that he was "sure" that he never had participated in any conversations about terrorism or plots against the United States or anywhere else.

Though Abassi falsely claimed that he had no knowledge of any terrorist threats that Esseghaier was planning, he noted that Esseghaier "may have insinuated" a plot, but that he (Abassi) had not been paying attention. Abassi also denied any knowledge of Esseghaier having contact with individuals affiliated with al Qaeda or any other terrorist group designated by the United States, though Esseghaier had told Abassi that he (Esseghaier) had traveled overseas and met with individuals affiliated with al Qaeda.

When asked whether Esseghaier was a threat to the United States or any other country, Abassi said that he was not able to evaluate whether Esseghaier was a threat to the United States. Abassi said, "We are guests to this country and I do not think he is a threat to the United States." Abassi claimed that he (Abassi) was against threats to the United States or terrorist activities. Abassi made similar statements when asked about conversations with the UC.

Abassi also falsely said that he had visited Las Vegas to explore real estate opportunities. Abassi claimed that the UC had showed him properties on the Internet, and that the UC had explained to him how the UC conducted business. Abassi said that he had visited Las Vegas for training and to gather new ideas, and to determine whether Las Vegas would be a good location to purchase property. None of that was true.

### E. Abassi's Post-Arrest Statements

At the conclusion of the non-custodial interview at JFK on April 22, described above, agents placed Abassi under arrest and advised him of his Miranda rights. Abassi waived those rights orally and in writing, and agreed to speak with the agents. Abassi then waived, on a daily basis, orally and in writing, his right to a speedy presentment, and continued to speak to agents on a daily basis through April 29, 2013, when Abassi asked to be brought before a judge.

During that interview Abassi continued to make false and/or self-serving statements, in addition to statements that incriminated him.

Abassi admitted to meeting the UC through "Chiheb" (i.e., Esseghaier) and that he, Esseghaier, and the UC had dinner together in Quebec in late 2012. Initially, Abassi repeated his lie that he was unaware of Esseghaier's involvement in any terrorist plot. However, two days later, Abassi admitted that Esseghaier had revealed several terrorist plots, including poisoning food and water at a civilian or military facility and other plots.

When asked about the purpose for filing the visa application, Abassi stated that he sought the visa to gain multiple entries into the United States. However, Abassi again lied and said he was in the process of learning about real estate.

Later in the interviews, Abassi admitted that one of his reasons for traveling to Las Vegas to meet Individual-2 was to help the "brothers" in Syria. Abassi admitted that he

8

wanted to send money to support the Syrian revolution, but falsely denied wanting to send money specifically to the Nusrah Front.

## II. Procedural History

As described above, agents arrested Abassi on April 22, 2013. That same day, a grand jury in this district returned Indictment 13 Cr. 304 (MGC) (the "Indictment") against Abassi, charging him with two counts of fraud and misuse of visas to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1546(a). On May 2, 2013, Abassi was arraigned on the Indictment in this Court.

On June 3, 2014, the Government filed the Superseding Information, charging Abassi with one count of making a false statement, in violation of 18 U.S.C. § 1001, and one misdemeanor count of attempting to knowingly possess an identification device, in violation of 18 U.S.C. § 1028(f). Abassi pled guilty to both counts the same day. Sentencing is scheduled for July 16 at 2:30.

## III. The PSR and Guidelines Calculation

The U.S. Probation Office has calculated a total offense level of eight and a Criminal History Category of I, resulting in a Guidelines range of zero to six months' imprisonment. (PSR ¶¶ 35, 38, 57.) The Government agrees with that calculation.

## IV. Abassi's Conduct Warrants an Above-Guidelines Sentence

A term of imprisonment greater than the zero to six months recommended by the Guidelines is appropriate here. To be clear, there is no dispute that Abassi repeatedly and emphatically refused to participate in the terrorist and violent plots proposed by Esseghaier. Indeed, Esseghaier encouraged the UC to cut all ties with Abassi. Nor does the Government

dispute that Abassi committed the charged crimes, in part, because he hoped to obtain a new Canadian visa and return to his wife in Canada.

However, Abassi's conversations with Esseghaier and the UC, summarized and quoted above, make clear that Abassi also hoped to recruit individuals to send money to and otherwise support the Nusrah Front in Syria, a designated foreign terrorist organization which, as Abassi knew, is closely aligned with al Qaeda. Those conversations also suggest that Abassi was not unilaterally opposed to attacking Americans, but rather that he believed that such attacks were not worth the risk unless they resulted in a very large number of American casualties. Those motivations enhance Abassi's culpability and warrant consideration by the Court at sentencing.

In addition, and to further his goal of supporting the Nusrah Front, Abassi described to the UC his conversations with Individual-1, who Abassi said could deliver money and weapons to the Nusrah Front. Abassi proposed that the UC meet Individual-2 for that purpose. Abassi also went so far as to fly to Las Vegas with the UC in an attempt to convince Individual-2 to give money to the Nusrah Front. And finally, Abassi lied to investigators about the reason for that Las Vegas trip and to protect Esseghaier and the UC.

In short, though the Government does not believe that the Guidelines terrorism enhancement is warranted on the particular facts of this case, see U.S.S.G. § 3A1.4, the exercise of reasonableness, and the Court's application of the factors set out in 18 U.S.C. § 3553(a) should not negate all of the evidence and information demonstrating that Abassi was far more— and far more dangerous—than simply an immigration fraudster. For all of the reasons set out above, a term of imprisonment greater than six months is warranted here.

## V. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence above the applicable Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
July 14, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/ MICHAEL FERRARA
JOHN P. CRONAN
BENJAMIN A. NAFTALIS
MICHAEL FERRARA
Assistant U.S. Attorneys
212-637 2526

# CERTIFICATE OF SERVICE

I certify that on July 14, 2014, I served a copy of the above Sentencing Submission on Assistant Federal Defender Sabrina P. Shroff, counsel to defendant Ahmed Abassi, via email and electronic filing on ECF.

/s/ MICHAEL FERRARA
Assistant U.S. Attorney