UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA     :

  - v -                  :          S1 13 CR 304 (MGC)

AHMED ABASSI,         :

            Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## AHMED ABASSI'S SENTENCING MEMORANDUM


David E. Patton, Esq.
Federal Defenders of New York, Inc.
Attorneys for Ahmed Abassi
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8713


Sabrina P. Shroff, Esq.
  Of Counsel


TO:   Preet Bharara, Esq.
      United States Attorney
      Southern District Of New York
      One St. Andrew's Plaza
      New York, New York  10007
      Attn:  Michael Ferrara, Esq.
           Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA      :

  - v -                      :

AHMED ABASSI,           :

         Defendant.      :

S1 13 CR 304 (MGC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## AHMED ABASSI'S SENTENCING MEMORANDUM

This sentencing memorandum is submitted on behalf of Ahmed Abassi ("Ahmed" or

"Mr. Abassi") in support of his request for a sentence of time served, the sentence recommended

by the Department of Probation.

Mr. Abassi has pled guilty to one felony count of falsely informing government officials

at JFK Airport that he had traveled to the United States to work at a real estate company and one

misdemeanor count of falsely representing on a Green Card application that he was going to

work at a real estate company. In fact, as even the government concedes, Mr. Abassi traveled to

the U.S. and applied for a Green Card because he was trying to return to Canada, so he could re-

unite with his wife and continue his PhD studies.

This is not a "terrorism" case. The government dropped both the terrorism charge and

the terrorism enhancement because, despite the government's relentless attempts – via

undercover agent Tamer– to push Mr. Abassi to commit, or help commit, some sort of terroristic

act, Ahmed steadfastly refused to do so. Unable to point to any actual act by Mr. Abassi, the

government dwells on Ahmed's supposed extremist views. If Ahmed was really such an

extremist (rather than a young man placed in a desperate position by the U.S. and Canadian governments who said things to please the undercover agent, Ahmed's sole means of support and hope to return to Canada), Ahmed would have acted, and this would be a terrorism case. It is not, and the Court should not treat it like one for sentencing purposes.

The Probation Department has properly calculated the guideline range (zero to six months) on this false statements case. We respectfully submit that a sentence of the 15 months already served – more than double the far end of the recommended guideline range – is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See 18 U.S.C. § 3553(a).[1] In this regard, Mr. Abassi has learned his lesson, is not a recidivism risk, and the possibility of 15 months in jail will certainly deter others from lying on their visa or green card applications.

## I.   BACKGROUND

Ahmed Abassi is a 27-year-old engineering student with no prior criminal history. PSR ¶¶ 36-41. The youngest of seven children, he was raised in a middle class family in Tunisia by two loving and supportive parents. The children all got along with each other. All of Mr. Abassi's siblings reside in Tunisia, with the exception of his sister Amira, who is pursuing her PhD in Geology at University Laval in Canada. Id. ¶¶ 43-44. Letters from the family are attached as Exhibits E to N.

Ahmed had always been a good student and did well enough in school in Tunisia to study

---

[1] This is particularly true when more than four of these 15 months were spent inside the MCC's Segregated Housing Unit, where Mr. Abassi was in 24 hour lockdown and complete isolation (other than a handful of meetings with his attorneys). His food was delivered to him through a slot 10 inches wide.

abroad. In August 2012, Ahmed was a student at Laval University in Canada. At Laval, he met Yousra Ben Msallem, a fellow student and friend of his sister Amira Abassi. Ms. Ben Msallem came from the same small town he did (Sbika-Kairuan) in Tunisia. His sister Amira was thrilled when her brother proposed to Ms. Ben Msallem. PSR ¶ 45. Ms. Ben Msallem's letter to the Court is attached as Exhibit AA to D.

Life was good, and Ahmed's future with Yousra looked promising. Both were in the midst of their dissertations. In addition, Ahmed had a job which provided him with practical experience in his chosen engineering field. See Exhibit P (letter from Professor Jesse Greener).

The couple decided to go home to Tunisia to celebrate their marriage with their extended families. PSR ¶ 8. As enjoyable as it was to return home and see family, they both still looked forward to returning to Canada in late January. Days before their anticipated departure, however, Ahmed received an email informing him that his Canadian visa had been revoked. Id.

## A. Undercover Agent Tamer

Both Yousra and Abassi were well-liked, with a large group of acquaintances. One of those acquaintances – Tamer– was an undercover agent for the Federal Bureau of Investigation. In time, Tamer ingratiated himself, his thoughts, his philosophy, and his agenda, into Ahmed's life. From the moment they were introduced, Tamer offered to be Ahmed's guide and life coach. Tamer would call or email Ahmed almost every day. He also visited Ahmed on two occasions in the Fall of 2012, pretending to have business in Canada.

Everyone who knows Ahmed describes him as an intelligent, kind, generous and considerate friend. But, at that time, he was also young, opinionated and impressionable. Slowly

4

and steadily, Tamer cultivated a relationship with Ahmed, and tried (unsuccessfully) to groom him to become a terrorist.

Tamer presented himself as someone Ahmed should look up to and emulate – a Muslim man who had his own successful real estate business. He had, as he repeatedly told Ahmed, succeeded as a Muslim despite the mean spiritedness of Western infidels. Tamer repeatedly spoke of how, driven by his sense of religion and duty to jihad, he was using his millions to support the Muslim cause, not just in America but in Syria, Egypt and Jordan.

Each time Tamer met with Ahmed, Tamer would steer the conversation towards the plight of the Muslim man, concepts of jihad, the Quran, and the need to support the Arab Spring. In addition, no matter the occasion, Tamer would try to get Ahmed to come to the United States.

In November 2012, Tamer offered to have Ahmed and his wife come to New York as his guests for a holiday. The young couple declined. Ahmed and Yousra were going to Tunisia to see family and celebrate their wedding, and had no interest in coming to the United States. After Canada cancelled Ahmed's visa, (whether at the apparent urging of U.S. officials or not, see PSR ¶ 8) Tamer saw his chance. As described below, Tamer made sure Ahmed believed his only recourse back to Canada was through Tamer.

## B. Ahmed's Efforts to Return to Canada, and Tamer's Successful Effort to Lure Ahmed to New York

When Ahmed received notice that his visa had been revoked, his life began to fall apart. His wife, Yousra, eventually went to Canada without him, and he faced the frightening possibility of never being able to return to Canada to join her. Moreover, while Ahmed and Yousra were in Tunisia, his older brother, Mourad, was in a terrible car accident.

Late in the evening of January 28, 2013, Mourad's car was driven off the road after being struck by another truck. Mourad was in critical condition, in a coma, and unable to breathe on his own. See Exhibit I and Q(Letter from Mourad Abassi and Medical Records of Mourad Abassi). Just a day or two after the accident, Yousra was forced to return to Canada without Ahmed. Ahmed and his family were distraught and emotionally vulnerable, and Tamer seized this opportunity to further ingratiate himself with Ahmed, and trick Ahmed into coming to New York.

Feigning sympathy for Mourad, Tamer lied to Ahmed and promised he would get his company lawyer to investigate and resolve Ahmed's visa problem. See Exhibit R (Transcript of January 30, 2013 telephone call at 19). Tamer also enticed Ahmed with the promise of being close to Yousra while Ahmed worked to return to Canada:

Tamer: "What do you think if I bring you here to New York? I... you stay with me... you know that I have apartments without... I mean they're empty, empty apartments, and I will give you one of them... You will stay by yourself in an apartment I mean it will be your apartment, until you get your stuff ready for Canada, God willing. I mean you will stay as long as you want and you will be close to me here and close to your wife, and close to your work, and everything, until you know what is going to happen. I mean it's a... from Quebec to New York I mean... An hour? One hour flight at the most, one hour at the most, right?"

See Exhibit S (Transcript of Feb. 1, 2013 Telephone Call) at 15-16; see id. at 19 (Tamer pretending to convey his lawyer's immigration advice to Ahmed).

When Ahmed failed to commit to going to the United States, Tamer reached out to Yousra. Yousra, however, remained hopeful that Canada would resolve Ahmed's visa issue. Both Ahmed and Yousra had been actively seeking the assistance of others – Ahmed's professors, non-profit groups in Canada, their immigration attorney in Canada, and local

6

politicians and the Canadian ministry – and Yousra remained hopeful their efforts would culminate in fixing Ahmed's Canadian visa problem. <u>See</u> Exhibit A (Transcript of February 26, 2013 conversation between Tamer and Yousra); <u>see</u> <u>also</u> Exhibit C (numerous emails sent by Ahmed and Yousra trying to resolve the Canadian visa issue directly with Canada).

For Tamer, the pressures were different. He needed to convince Ahmed to travel to the United States quickly. His plan depended on Ahmed being in the United States. Accordingly, he played on the young couple's fears, repeatedly telling them to apply for an American visa now, before Canada makes a "final decision" on his application, as a formal "denial" by Canada would ruin Ahmed's chances at an American visa and he would be stuck forever in Tunisia. Tamer repeatedly emphasized the need for Ahmed to act quickly, not only in many phone calls, but by e-mail. <u>See</u> Exhibit T (E-mail from Tamer dated February 7, 2013).

Tamer also pressured Ahmed's parents, who were easier to coax into submission. Ahmed's mother and father were both still dealing with their son Mourad who remained in critical condition. His lungs were destroyed and he was at risk of respiratory failure. The hospital bills were piling up and Ahmed's parents were close to broke, having just spent money on Ahmed's wedding. To them, the offer of help from Tamer was a huge relief and a natural and normal offer from a friend.

Tamer was relentless in his efforts to get Ahmed to apply for an American visa. He called, he emailed, and, at one point, he even made several airline bookings from Tunisia to New York, and offered Ahmed the option of choosing a flight at the last minute. <u>See</u> Exhibit AA, (Letter to court from Yousra Ben Msallem.)

Finally, to ensure he was trusted, and to make sure the Abassi family felt indebted to him, Tamer wired 800 dollars to the Abassi family.[2] See Exhibit U (e-mail from Tamer dated February 8, 2013) Along with the money came the continued refrain – I am a friend to the entire Abassi family. I am like your son, your brother, I am one of your family. Send your son Ahmed to me, and I will take care of him. Overwhelmed by Mourad's hospitalization and their other son's visa problems, the parents finally acquiesced and told Ahmed to go to the United States.

## C. The Visa-Related False Statement

On March 18, 2013, Abassi flew from Tunisia to New York. PSR ¶ 10. Upon his arrival, Ahmed falsely stated that he planned to work for Tamer's real estate company while in the United States. Id. Ahmed deeply regrets his decision to lie to immigration. He will not do so again.

That said, there would have been no lie without Tamer. Without Tamer, Ahmed would not have tried to enter the United States, or apply for a visa. Without Tamer, Ahmed would not have applied for a business visa, and been asked the question that led to the lie. Most importantly, without Tamer, Ahmed would not have been convinced that his only hope of ever getting into Canada and seeing his wife was to first get into the United States. Without Tamer, Ahmed would have been, at worst, an unhappy but free man living in Tunisia.

---

[2] Even when offering to help the elderly grieving parents whose son is in a coma, Tamer injects into the conversation that, as a Muslim sending money to a Muslim country, the transmission could be misconstrued as an act supporting terrorism. The reference slips past the grieving family and they remain pre-occupied with their son's health.

## D. Tamer's Unsuccessful Efforts to Get
## Ahmed to Commit an Act of Terrorism

Once Ahmed arrived in the United States, he fell deeper into the unimpeded control and influence of Tamer. Tamer was Ahmed's sole means of support and best hope of getting back to Canada. Tamer gave Ahmed a place to live – not just a place, a place in a beautiful skyscraper in Manhattan near the Ritz Carlton hotel.

Ensconced in a one bedroom doorman apartment at 90 West Street in Manhattan, Ahmed was supported by Tamer. The apartment was furnished and Ahmed had a TV in every room, and a computer for his use. Tamer provided it all: housing, food, transportation, and, of course, an imaginary lawyer to help Ahmed address his problems with his Canadian visa. To complete the disguise, Tamer's apartment was equipped with a special Quran for Ahmed, and the apartment was wired for the prayer call five times a day.

For the next month, Tamer and Ahmed had hundreds of conversations. Most (but not all) of these conversations were recorded. Although each conversation is different, each one follows a general pattern. At some point during each conversation, Tamer inserts into the dialog (1) the western world's mistreatment of Muslims; (2) the need for the "brothers," whether in Syria, Jordan, Tunisia or some other Arab country, to be supported by money, weapons or other means; (3) each Muslim brother's duty to do jihad; (4) Tamer's past willingness to donate money to support jihad; and/or (5) coaxing Ahmed into making terror plans (small and big) as that is the

way to be a good Muslim.[3]

For every statement made by Ahmed that the government may quote in its sentencing submission, there is a precursor conversation, comment, or other impetus from undercover agent Tamer inviting and encouraging that quoted response from Ahmed.[4]

Moreover, whatever Ahmed may have said to please the man he viewed as his protector, sole support, and best hope, those words were never, ever followed by any improper action or even a plan for an improper action.  To the contrary:

1. At no point in time does Mr. Abassi ever undertake a single act of violence or even a single precursor step toward an act of violence.

2. When asked to formulate an actual plan for a terrorist act, Ahmed refuses. He refuses to formulate a big plan and also refuses Tamer's request to formulate a small plan of terror. In fact, he tells Tamer that he is merely discussing principles and that not only does he not have a plan, he doesn't even know how to formulate a plan. See Exhibit V, pages 141-142. (Summary Transcript of March 29, 2013 conversation).

3. When asked to travel to Iran to get bomb training, Ahmed refuses.

4. When asked to undertake a small plan for a terrorist act, Ahmed refuses.

5. Ahmed is so adamant in his refusal to actually participate in any criminal act that the other target in the case (Chiheb) mistrusts him and wants Ahmed thrown out of the apartment and out of New York. Ahmed has proved to be nothing more than a talker,

---

[3] Working more than one target, Tamer invited Chiheb Esseghaier to join them in New York.  The government has produced some but not all the conversations between Mr. Esseghaier and their undercover agent, Tamer. It is undisputed, however, that Mr. Esseghaier was unable to convince Ahmed to participate in Esseghaier's terrorism plans. Indeed, Mr. Esseghaier became so frustrated by Ahmed's continuing refusals that he brands Ahmed as "useless to the cause" and "not a true Muslim," and urged Tamer to throw Ahmed out of his apartment and New York. See Exhibit W, Page 000130 to 000131 (Summary Transcript of March 27 and 28, 2013 Conversation).

[4] At times, Ahmed is simply not interested in speaking or engaging in these incendiary discussions. To illustrate, Tamer arranges a discussion between the three of them (Tamer, Ahmed and Chiheb), and Ahmed, who is fed up, cedes his opportunity to speak, but Tamer intervenes. Intent on getting Ahmed to make incriminatory and incendiary statements, Tamer insists that Ahmed use his turn and express his opinions. "UCE invites AA to talk but AA is ready to forego his turn, but UCE insists AA take his turn to speak." See Exhibit V, page 000155 (Summary Transcript of March 29, 2013 conversation).

Chiheb says, and therefore useless to the cause of jihad.

6. Unlike the other target (Chiheb) who gives money to Tamer and tells him to send the money to jihadis in Syria or Mali, Ahmed never gives a single dollar to any foreign terrorist organization.

7. Ahmed never recruits another person to commit to an act of terrorism.

Moreover, the focus of Ahmed's actions center not around Jihad, but on returning to Canada, where his wife and life await his return. Thus:

8. Left to his own devices, Ahmed emails various individuals in Canada and in the Canadian government trying to resolve his visa problem, so he can return to Canada[5].

9. Ahmed applies for more than 20 jobs in Canada as he is sure that he will be successful in resolving his visa problems and will be able to reunite with this wife, and continue their life in Canada.

10. Throughout his time at 90 West, almost every single day, Ahmed sends out emails trying to resolve his visa issues so he can return to Canada. And, almost every single day, he applies for jobs in Canada, so he can reunite with his wife.

Indeed, Chiheb warns Tamer that Ahmed is not interested in Jihad, but in returning to Canada.[6]

"Chiheb warns UCE that AA's solution is to spend UCE's money on his studies and his life expenses with wife." See Exhibit W at Page 130 (Summary Transcript of March 27 and 28, 2013 Conversation) The government does not (and cannot) dispute these important facts.

It is always Tamer who directs the conversation. It is always Tamer who makes plans.

And, it is always Ahmed who says no. To illustrate, on page 000127 of the discovery Ahmed

---

[5] Defense counsel has counted over 50 e-mails sent by Mr. Abassi from his Laval University e-mail account to agencies and individuals asking for help to resolve his visa situation. These emails were sent between February 2013 and April 2013. A large portion of the e-mails were sent while Mr. Abassi was in New York.

[6] Chiheb's assessment of Mr. Abassi is accurate: on March 27, 2013, Ahmed has a job interview (by phone) with Alcoa in Quebec. See Exhibit W, page 000126(Summary Transcript of March 27 and 28, 2013 Conversation).

refuses to undertake any action, saying that he has a lot of personal problems and is not interested in any plan for jihad. He repeats his disinterest again on page 141 and two pages later tell the other target in the investigation (Chiheb) that he should focus on his PhD and get an education and not bother with jihad. <u>See</u> Exhibit W, Page 127(Summary Transcript of March 27 and 28, 2013 Conversation).

### E. The Las Vegas Dinner

Perhaps realizing that Ahmed cannot be pushed into terror, Tamer begins to ask Ahmed to identify and reach out to people he knows in America.[7] When Ahmed tells Tamer he knows a man from Tunisia who now lives in Las Vegas, Tamer fabricates a story about a conference he needs to attend, and convinces Ahmed to fly to Las Vegas with him (at Tamer's expense, of course).

Ironically, the person – Fathi – is someone Ahmed hasn't seen or interacted with in five years. Ahmed hardly knows anything about Fathi or his life in Las Vegas. Undeterred, Tamer, the ever aggressive undercover agent, flies them both to Las Vegas to try to "recruit" a putative jihadist! Once again, despite spending thousands of dollars and thousands of hours, Tamer comes up empty. All his efforts to groom Ahmed into a terrorist have failed.

Tamer arranges a long and elaborate dinner. He deliberately steers the dinner conversation between him, Ahmed, and Fathi to the topic dearest to Tamer – jihad. The result of this conversation, however, is no different than the result of every other conversation – nothing.

---

[7] Ahmed also identifies an individual overseas that Tamer allegedly could approach to help send money or weapons to Syria. Nothing comes of this, and there is no evidence that Ahmed actually knew this person, or that the person really would have assisted in any terroristic act.

Nothing happens.

To Tamer's great disappointment, the conversation remains rooted in philosophy and the Quran and, once again, Tamer is unable to get either Fathi or Ahmed to undertake a single act. He can't even convince them to make a donation to a foreign terrorist organization.

No one devises, let alone commits to, a plan of terror. Ahmed simply has one more loud, opinionated, and pointless conversation about jihad, Syrian dictator Bashir Assad, and the plight of Muslims everywhere. Impressed however, by the quality of the food at the Las Vegas restaurant, Ahmed takes pictures of the beautiful desserts that they are served. One of these photos is attached as Exhibit X.

### F.  Ahmed's Arrest and Imprisonment

Upon his return from Las Vegas on April 22, 2013, Ahmed was arrested at the airport, and has been in jail ever since. PSR ¶ 13. After months of discovery, the government dropped its terrorism claims, and Ahmed pleaded guilty to making false statements on arriving at JFK and on his Green Card application. Id. ¶¶ 1-4. Neither crime would have been possible without Tamer and the Federal Bureau of Investigations.

### G.  The Repercussions of Ahmed's Arrest

It is no exaggeration to say that Ahmed's life is now completely ruined. His arrest was publicized in a press release issued by the United States Attorney's Office branding Ahmed as a terrorist. The media frenzy that followed has had long-lasting repercussions, not just for him but for his entire family.

Ahmed's parents, elderly and in poor health, were swarmed by the press and nearly died

from the shock of their son's arrest. It is impossible to adequately describe to the Court their fear and pain when they learned of their son's shocking arrest from the press.

Yousra's life is no longer hers. After Ahmed's arrest, she could not leave her house without being hounded by the unrelenting press. Indeed, so great was the notoriety of the case that neither she, nor Ahmed's sister Amira, could leave their home. Both had to stay home from work and remain hidden until the press calmed down.

Because of Ahmed's arrest, Yousra faced immense pressure to divorce her husband of seven months. Yousra's parents insisted she had a choice to make – them or her husband. The pressure and press scrutiny led Yousra to be hospitalized several time. She almost succumbed and Ahmed for a divorce before changing her mind, as she could not bear to leave her young husband.

## II.   **ARGUMENT**

### A. **A SENTENCE OF THE 15 MONTHS ALREADY SERVED IS MORE THAN ENOUGH TO MEET THE GOALS OF SENTENCING PURSUANT TO 18 U.S.C. 3553(A)**

#### I.   **The Statutory Standard**

The sentencing statute directs the Court to impose a sentence "not greater than necessary to comply with the purposes of sentencing." These purposes require the sentence imposed to:

A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B) afford adequate deterrence to criminal conduct;

C) protect the public from further crimes of the defendant; and

D) provide the defendant with needed educational or vocational training, medical care, or

14

other treatment in the most effective manner.

18 U.S.C. 3553(a)(2).

In determining the lowest sentence necessary to achieve these objectives, this Court is directed to consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available and the applicable guidelines range; and the need to avoid unwarranted disparity among similarly situated defendants. 18 U.S.C. 3553(a)(1)(3)-(6).

## B. TIME SERVED ACCORDS WITH THE ADVISORY GUIDELINES RANGE

Mr. Abassi has pled guilty to one felony and one misdemeanor count of a false statement. His advisory Sentencing Guidelines range of zero to six months' imprisonment is based on an offense level of eight and a true criminal history category of I. See PSR at fn.1 and ¶ 57. All parties agree zero to six months is the correct guideline range. Id.

In accord with the advisory Guidelines range and the facts, the Probation Department recommends a sentence of time served (15 months). This time is more than twice the high-end of the guideline range. Notably, time served is also in keeping with the sentence requested by the government – a sentence above the guideline range. As discussed below, however the government's justifications for its requested above-guideline sentence are improper and should be rejected by the Court.

Monograph 107 requires the Probation Department to consider the statutory factors related to sentencing, including the specific nature of the crime (set up by the government? sophisticated? affecting many victims? violent?); the actions of the defendant (what is his history? has he been cooperative? has he demonstrated true acceptance of responsibility?); just

15

punishment (what role did he play in the offense? What were the circumstances that led to his role in the offense? Is anything needed to keep him from re-offending?); and protection of the community. In considering all of the above, the Probation Department, which in this District only rarely recommends a sentence of time served, recommends such a sentence here. Their recommendation reflects the truly unique circumstances of this case and the fact that Ahmed Abassi refused to undertake any terror act (large or small) despite intensive efforts by an undercover agent. Probation's recommendation should be followed. Ahmed should be sentenced to time served and be allowed to go home.

## C. THE GOVERNMENT'S SENTENCING ARGUMENTS SHOULD BE REJECTED AND WOULD REQUIRE A *FATICO* HEARING

### I.  The Government's Suggestion that Mr. Abassi be Incarcerated for his "views" is Entirely Inappropriate.

The government requests a sentence above the guideline range of 0 to 6 months. As Mr. Abassi has served 15 months, a sentence of time-served is an above-guideline sentence. Thus, the government's entire sentencing submission, and its factual predicate, is at best academic.

However, to leave their arguments unanswered would be doing a disservice not just to Mr. Abassi but also to the principles of sentencing. The government is asking the Court to punish Mr. Abassi for having "extremist views" and for lying to the FBI in his post-arrest statements. Except for shouting "fire" in a crowded theatre, mere talking should never result in prison time, and Ahmed Abassi has not been charged, and is not being sentenced for what he said to the FBI in a post-arrest statement that was the result of 7 days of isolation.

It should be clear at the outset that to the extent Mr. Abassi now has extremist views the

government is largely responsible for them. More importantly it should be equally clear that we, as a country, do not jail people for having thoughts – bad thoughts, vile thoughts, racist thoughts, or prurient thoughts. Thoughts are not crimes and we do not punish people for having them. This should be particularly true when the thoughts are the product of governmental conduct.

Under our criminal justice system, we do seek to convict or punish people based on fear of what they might do in the future. As the Tenth Circuit has noted, our society does not punish a person based on "the prospect the he would commit … crimes when he got the opportunity." *United States v. Allen*, 488 F.3d 1244, 1260 (10th Cir. 2007). While it may be tempting to depart from that principle when the contemplated deeds are horrific beyond measure, "courts must refrain from doing so" even when the government is asking them for precisely such a thing. *Id.* at 1260-61. The government's naked speculation that Mr. Abassi would have committed other crimes had he not suspected that Tamer was an FBI agent, or because Abassi's "plans" were grander, is reminiscent of a world in which "would-be criminals are apprehended and punished for crimes they are predicted to commit, before they have a chance to actually commit them." *Allen*, 488 F.3d at 1260 & n.7. The Constitution simply does not allow us to punish someone for a crime they have not committed just because the government suspects he or she may one day do so.

## II. Based on the government's arguments, Mr. Abassi is entitled to a *Fatico* Hearing and asks to call Tamer as a witness

To the extent that the government continues to rely on the transcripts of conversations in this case, we ask the Court for a *Fatico* hearing. We further request, as we did during the plea proceeding, that the government produce their undercover agent Tamer as he would be the

defense's first witness. If the government were to produce undercover agent Tamer we would prove the following facts:

Tamer reached out to Ahmed Abassi with a purpose in mind—to get Ahmed to the United States, have him set up other Muslims to commit jihad, and subsequently arrest them all. Tamer failed. However hard Tamer tried, Ahmed refused to commit any act of jihad.

Unsurprisingly, Esseghaier (the main target of the investigation) complains that all he hears from Ahmed are words and no action. Tamer, trying to salvage his case, instructed him to be patient and nice to Ahmed so that Ahmed could be convinced to take action. On March 27 and March 28 of 2013, Ahmed rejects their efforts; he refuses to make or execute a plan. See Exhibit W, Page 000129(Summary Transcript of March 27 and 28, 2013 Conversation). Although Ahmed always talked about religion and what was happening in Syria, when asked to undertake a plan, Ahmed declined and instead instructed Chiheb to go and finish his Ph.D; "focus on the studies and not fight," says Ahmed. *Id.*

Were the government to produce their undercover agent we would prove that both Ahmed's failure to commit to any action almost caused a rift with his main target – Chiheb. Chiheb who sees Ahmed as a person only interested in studies and work insists that Tamer "drop AA because they can't work with a person like him" adding that, "'the brothers' would have immediately dropped a person like him" – meaning a person who refuses to undertake any action. Id. The government would not be able to dispute that Chiheb told Tamer in no uncertain terms that Ahmed was simply not a terrorist[8], that he was not "ready for the path of Allah" and is

---

[8] This assessment of Ahmed's character is shared by others who know him well. Notably, his professor and work supervisor at University Laval who met with Ahmed twice a week for a semester, characterizes him as "respectful,

in fact worse than Ra'ed (another person Chiheb and Tamer were trying to recruit) as "AA said no from the beginning but Ra'ed didn't say no regarding the short term plan but got afraid later." See Exhibit W, Page 000130(Summary Transcript of March 27 and 28, 2013 Conversation).

Ahmed, Chiheb accurately notes, is someone who just wants Tamer's money for his "studies" and "his expenses." Angry that Tamer does not see the similarity between Ahmed and Ra'ed ("Ahmed who wants money for his studies/life expense with his wife" and Ra'ed who wanted "money for a restaurant business"), Chiheb insists that Ahmed be abandoned and wants to "search for someone else or wait for the brothers in Dubai." Id.

Tamer, however, is not yet willing to give up on Ahmed and keeps the case going by begging Chiheb to give Ahmed more time and one more chance as he, Tamer, sees Ahmed's hatred towards America. To the extent the government persists in arguing this supposed "hatred" – a "hatred" that resulted in nothing despite months of relentless pressure – forms the basis for a proper sentence, we ask them to produce Tamer for testimony. A short examination would reveal that the only real "hatred" lies in the heart of an undercover who set out to create a terrorist out of an opinionated, but harmless 25-year-old student.

If anyone provides an accurate description of Ahmed, it is Chiheb, Tamer's main target. Chiheb tells Tamer that Ahmed is useless and actually a dangerous impediment to their mission. Chiheb insists that Ahmed be "thrown out of the apartment, call the guy who was helping

---

good natured, scientifically curious, honest and hardworking." Professor Greener "never [saw] anything 'radical' about Mr. Abassi. The most political I knew him to be, was to be following international news regarding the severe civil unrest in Syria. From talking to one of my students I learned that he was opposed to the Iranian government's support of the Syrian government. I did not find this particularly strange, since it was the top news story at the time and his perspective would have matched that of probably 95% of Canadians I knew on the matter." See Exhibit P.

Ahmed with his visa and tell him to stop what he is doing, also call the airline to change AA's flight ticket to the earliest date." See Exhibit W, Page 130 (Summary Transcript of March 27 and 28, 2013 Conversation).

Afraid that Ahmed will jeopardize their plans, Chiheb asks Tamer to spring his exodus upon Ahmed: "do not tell AA anything until all of the above is done. Visit him after and inform him that a taxi is waiting to take him to the airport." Id. Chiheb considers Ahmed so useless and dangerous to their mission that he offers to pay the costs of changing Ahmed's ticket to an immediate departure because "AA isn't sincere [in his desire to commit jihad] and because "AA contradicts himself." See Exhibit W, Page 131 (Summary Transcript of March 27 and 28, 2013 Conversation). Chiheb remains so adamant that Tamer pretends to relent and allows Chiheb to find a substitute for Ahmed. Id.

This is just one snippet of hundreds, if not thousands of hours, of Tamer trying (and failing) to convince Ahmed to become a terrorist. Rather than show any desire by Ahmed to be a terrorist, properly viewed, the evidence and conversations show a Ph.D candidate who talks incessantly, enjoys being a contrarian and arguing, but who is steadfast in his refusal to do anything – big or small – to harm others.

Thus on March 28, 2013, after the undercover agent convinces Chiheb to give "AA one more chance" to see if Ahmed will finally act, they try again. Again, Ahmed does not. Instead, Ahmed says: "I don't have any, I don't have a plan. I am talking about the principle; the principle." See Exhibit V, Page 000141(Summary Transcript of March 29, 2013 conversation). And, it is within this context – a discussion of a principle – that Ahmed says Chiheb's plan is too

small. When saying, "I wish America would disappear," Ahmed immediately notes that he is discussing a "general principle" and nothing more. When both continue to exert pressure on Ahmed, he says he is willing to "study for 10 years" and "after which he would return for the benefit of the Muslims." Again and again in the same conversation Ahmed says "I am not ready, I am not ready to do anything." 000149-50.[9] See Exhibit V, Page 149-50 (Summary Transcript of March 29, 2013 conversation).

To salvage the situation, Tamer asks Ahmed to agree to a small plan. To get out of this, Ahmed says a small plan is too small. He'd rather study for ten years. So one plan is too big, and the other is too small. We respectfully submit this is precisely what people say and do when they don't want to do what is being asked of them. Tamer's mission is a failure: Ahmed does nothing more than engage in conversations, all of which are precipitated by Tamer, an undercover agent.

In this very unusual fact pattern and steeped in this deep entrapment, the government asks the Court to punish Ahmed Abassi for his "extremist views." It is impossible to now parse out the role Tamer the undercover agent played. This is made even more difficult as the government continues to refuse defense's request to make Tamer available for testimony, thereby conceding that the inference they seek is not supportable by live testimony. In the absence of a *Fatico*

---

[9] Ahmed says it again during another conversation on March 29, 2013. Pretending to respect Chiheb he says "I don't make fun of it [your plan] but personally, I am not ready for it. As simple as that." See Exhibit V, Page 000157. (Summary Transcript of March 29, 2013 conversation). Ahmed also refuses to go to Iran. Id, P. 158. As Ahmed declines to commit, Esseghaier gets very angry and a fight between the two breaks out. Esseighaier yells at Ahmed: "You left it open, you left it open. We need you now (shouting) not when I become ready I will call you. This is not enough for me because the time maybe one month, five years, ten years….." For Ahmed, the time was never. He was never going to undertake an act no matter how he was pushed.Id Page 180. Then Chiheb proposes that Ahmed go for training. Again, Ahmed refuses and Chiheb is so furious he says: "we can't talk about these things if we don't do the training. So, I proposed to him [Ahmed] a training, but he [Ahmed] said I am not ready." Fed up with Ahmed, Chiheb tells Tamer "For me, I am done, I got my answer, I don't have [any]thing else to say to him." Id, Page 182.

hearing, the Court should simply refuse to give credence to their arguments.

## IV.  TIME SERVED ACCORDS WITH THE GOALS OF SENTENCING

In accordance with the parsimony principle underlying federal sentencing, a sentence of time served is sufficient but not greater than necessary to accomplish the goals of sentencing under § 3553(a): punishment, deterrence and rehabilitation.[10]

### A.  Time Served Accords with the Sentencing Goal of Appropriate Punishment

Regarding the sentencing goal of imposing a just punishment, a review of the nature of this offense demonstrates that Ahmed is relatively less culpable than other offenders. Defendants like Ahmed, who play a minor role and accept responsibility, and whose crimes were the result of a large degree of governmental entrapment, do not involve violence, and cause less serious injury should receive probation or less lengthy jail sentences. *See* U.S. Sentencing Commission Research Series on the Recidivism of Federal Guideline Offenders, *Recidivism and the "First Offender"* at 9-10 (May 2004).

Ahmed is a true first-time offender with no previous arrests.  His offense is not a crime of violence and there is no individual victim in this case. Finally, Ahmed has accepted full responsibility for his actions.  This places Ahmed squarely in the category of defendants for whom Congress specifically recommends a low or non-custodial sentence. In this regard, 28 U.S.C. § 994(j) states that a sentence other than prison is generally appropriate for the "first offender who has not been convicted of a crime of violence or an otherwise serious offense."

---

[10] The sentencing goal of providing the defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner (18 U.S.C. 3553(a)(2)) is inapplicable here.

Moreover, given that Ahmed has no legal status in the United States, and given the Order of Removal he agreed to, he will certainly be deported upon his release.

### B. Time Served Accords with the Sentencing Goals of Deterrence and Rehabilitation

The remaining two sentencing goals identified in 18 U.S.C. § 3553(a), deterrence and rehabilitation, also support a sentence of time served. On an individual level, the Court should recognize that a sentence of 15 months incarceration, and deportation from this country thereafter, is far more than necessary to deter Mr. Abassi from engaging in immigration fraud by making a false statement ever again.

Mr. Abassi's long life of law-abiding behavior prior to this offense, and the unique circumstances surrounding his false statements, show he is unlikely to recidivate if given a sentence of his 15 months served. Ahmed has learned his lesson and will not violate the law again. His arrest and conviction also have led him to realize that words, however empty, can sometime have terrible consequences.

The Sentencing Commission's own historical studies support the idea that Ahmed shows an extremely low risk for recidivism. *See Recidivism and the "First Offender"* at 13-14. The recidivism rate is 6.8%, significantly lower than individuals with prior criminal acts.[11] *Id.* Mr. Abassi also has a majority of characteristics that are correlated with lower recidivism rates: he is well educated; he maintained stable employment in the years prior to his arrest; he attended college; he has never used drugs; and he has never committed a violent offense. *Id.*(citations

---

[11] In the study recidivism was defined to include both new convictions and supervision violations. The rate of new convictions for first offenders like Mr. Abassi is only 2.5%. *Id.* at 13-14.

omitted). For all of these reasons, there is absolutely no basis to conclude that further imprisonment (or even 15 months) is necessary to deter Ahmed from committing future crimes.

More generally, as described above, his arrest and the media frenzy it engendered have already had a powerful, negative impact on him, his reputation, and likely his future. To be branded a terrorist is not something Ahmed ever expected. Nor did he expect the shame and humiliation of being handcuffed, locked up and publicly reprimanded. The public nature of his arrest, and resulting consequences to him, have not only deterred and rehabilitated him, it surely will deter others from following the same path.

## V. CONCLUSION

As noted in Professor Greener's letter to the Court, Ahmed Abassi is a capable, impressive and hardworking young student. Professor Greener, like many of Mr. Abassi's friends and family, asserts that he "is a good man, with a much loved family, who is legitimately interested in contributing to society through his work in science." See Exhibit P. He should be allowed that opportunity. For the past 15 months, not only has Mr. Abassi and his family suffered greatly, but the University at which he was studying and working diligently has also suffered the loss o Mr. Abassi's absence. Professor Greener notes that his group was affected by Mr. Abassi's absence and was forced to re-start all of the research that he had been working on. The dozens of people who have written on Mr. Abassi's behalf can attest to the fact that he is a man of good character who has worked hard his whole life to better himself, his family, and society. It is fair to say that his conduct in this case was aberrant. During a desperate time in his life, he resorted to a desperate and illegal measure to re-unite with his family.

Mr. Abassi deeply regrets his conduct. He has acknowledged his mistakes and fully

accepted responsibility. He is ready to move on with a life outside the United States, and the Court should give him the opportunity to do so by sentencing him to time served. His experiences to date in this case have effectively deterred him from further criminal conduct, and there is no rational basis to conclude that a more severe punishment would have a greater deterrent effect.

For all these reasons, the Court should follow the recommendation of the Probation Department and impose a sentence of the 15 months already served by Mr. Abassi. Such a sentence – which is far greater that the zero to six months – is sufficient but not greater than necessary to accomplish the primary aims of sentencing under § 3553(a), including punishment, deterrence and rehabilitation.

Dated: New York, New York
      July _14_, 2014

                             Respectfully submitted,

                             David E. Patton, Esq.
                             Federal Defenders of New York, Inc.

                             By:_____*SPS*_____
                             Sabrina Shroff, Esq.
                             Attorney for Ahmed Abassi
                             52 Duane Street - 10th Floor
                             New York, NY 10007
                             Tel.: (212) 417-8713